**ORGANIZATION OF MINORITY VENDORS, INC., an Illinois corporation, et al., Plaintiff,**

v.

**ILLINOIS CENTRAL GULF RAILROAD, et al., Defendant.**

No. 79 C 1512.

United States District Court, N.D. Illinois, E.D.

Dec. 9, 1983.

**578**

Robert S. Atkins, Robert F. Coleman, Kenneth P. Ross, Freeman, Atkins & Coleman, Chicago, Ill., for plaintiffs.

Joseph Nagle, Evan B. Karnes II, Chicago, Ill., for Richard B. Ogilvie, Trustee of the property of the Chicago, Milwaukee, St. Paul and Pacific R.R. Co., debtor.

George Hennig, Thomas H. Morsch, Edna S. Epstein, Sidley & Austin, Chicago, Ill., for Koppers Co., Inc.

Warren C. Ingersoll, Lord, Bissell & Brook, Chicago, Ill., for Railhead Corp.

Thomas J. Healey, Jeffrey K. Mercer, Chicago, Ill., for Illinois Central Gulf R.R.

O.L. Houts, Chicago, Ill., for William M. Gibbons, Trustee Chicago, Rock Island and Pacific R.R. debtor.

Stanley J. Adelman, Blaine Winship, Mark J. Friedman, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for The R.A. Pinney Co., Inc., Richard A. Pinney, Atlas Ry. Supply Co., Robert Holden, Sec'y, C.A. Bair, Pres., Unity Ry. Supply Co., and H.R. O'Connor.

Robert W. Gettleman, Jeffrey B. Schamis, D'Ancona, Pflaum, Wyatt & Riskind, Chicago, Ill., for Z.S. Frank, Wheels, Inc.

Jay Zabel, Martin Cohn & Associates, Ltd., Chicago, Ill., for John J. Hickey, Louis J. Gruber, Rails, Ltd.

Thomas E. Greenland, William R. Carney, James P. Daley, Chicago, Ill., for Chicago & Northwestern Trans. Co.

## MEMORANDUM AND ORDER

MORAN, District Judge.

### Introduction

At the heart of this seven-count complaint against twenty defendants is the claim that plaintiffs were subjected to racial discrimination by several railroads in the solicitation of bids and the awarding of contracts for supplies and services. Plaintiffs are the Organization of Minority Vendors (OMVI), an Illinois not-for-profit corporation organized for the purpose of protecting the civil rights and economic interests of businesses which qualify as minority business enterprises (MBEs) under regulations of the United States Department of Transportation (DOT) and fifteen individual black- or Hispanic-owned and controlled businesses which qualify as MBEs.[1] They bring this lawsuit as a class action on behalf of all similarly situated black- and Hispanic-owned and controlled business enterprises against two groups of defendants.

---

1. The original regulations defined an MBE as a "business organization having at least 50 per cent of its equity ... owned by minority group persons or where less than 50 per cent, the organization is controlled by such persons ...." 49 CFR § 265.5(j). This definition was later tightened so that MBEs had to be both owned and controlled by minority individuals.

Under the regulations "minority meant women, blacks, hispanics and American Indians, Eskimos, orientals and aleuts. 49 CFR § 265.5(i).

The first group consists of three Chicago based railroads: Illinois Central-Gulf Railroad, Chicago and Northwestern Transportation Company, and Chicago, Milwaukee, St. Paul and Pacific Railroad Company (railroad defendants)[2]. The second group of defendants consists of eighteen allegedly white male-owned and/or -controlled corporations and some of their owners and officers. These corporations are established suppliers of goods and services to the railroad defendants (contractor defendants).

Before the court are a variety of motions from the defendants which attack each count of the complaint. This court will summarize the statutory context of plaintiff's action, the history of this litigation, and the motions before the court, before addressing the merits of these motions.

### Statutory Background

The Railroad Revitalization and Regulatory Reform Act of 1976 (the 4–R Act), 45 U.S.C. § 801, *et seq.*, was enacted to "provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States." § 801(a). The Act provided hundreds of millions of dollars in federal financial assistance to railroads.

Section 905(a) of the Act was a general non-discrimination provision:

No person in the United States shall on the ground of race, color, national origin, or sex be excluded from participation in, or denied the benefits of, or be subjected to discrimination under, any project, program, or activity funded in whole or in part through financial assistance under this Act.

45 U.S.C. § 803. The legislative history indicates that the non-discrimination provision was enacted as part of "an established national policy, since at least the passage of the Civil Rights Act of 1964, to encourage and assist in the development of minority business enterprise." 1976 U.S.Code Cong. and Adm.News, p. 58. Because of the "significant assistance to be provided the railroad industry" by the 4–R Act, Congress decided that "encouragement for the participation of minority businesses was appropriate." *Id.* at 59.

Section 905(b) set forth a compliance mechanism which permitted the Secretary of Transportation (Secretary) to cut off funding for railroad recipients of 4–R Act funds which engaged in discrimination.[3] The Secretary could also refer a case of discrimination to the Attorney General or take action under Title VI of the Civil Rights Act, 42 U.S.C. 2000d, *et seq.*

Section 905(d) authorized the Secretary to "prescribe such regulations and take such actions as are necessary to monitor, enforce, and affirmatively carry out the purposes" of the anti-discrimination requirement. 45 U.S.C. § 803(d). Section 905(e) provided that "[a]ny determination made or actions taken by the Secretary pursuant to [the anti-discrimination] section

---

**2.** Plaintiffs have dropped the Chicago Rock Island and Pacific Railroad Company from this action.

**3.** Section 905(b) reads:

(1) Whenever the Secretary determines that any person receiving financial assistance, directly or indirectly, under this Act, or under any provision of law amended by this Act, has failed to comply with subsection (a) of this section, with any Federal civil rights Statute, or with any order or regulation issued under such a statute, the Secretary shall notify such person of such determination and shall direct such person to take such action as may be necessary to assure compliance with such subsection.

(2) If, within a reasonable period of time after receiving notification pursuant to paragraph (1) of this subsection, such person fails or refuses to comply with subsection (a) of this section, the Secretary shall—
(A) direct that no further Federal financial assistance be provided to such person;
(B) refer the matter to the Attorney General with a recommendation that an appropriate civil action be instituted;
(C) exercise the powers and functions provided by title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) [42 U.S.C.A. §§ 2000d et seq.]; and/or
(D) take such other actions as may be provided by law.
45 U.S.C. § 803(b).

shall be subject to judicial review." 45 U.S.C. § 803(e).

Another section of the comprehensive railroad legislation enacted in conjunction with § 905 required the Secretary to establish a Minority Business Resource Center (MBRC) as part of the Federal Railroad Administration (FRA). 49 U.S.C. § 1657a. MBRC's function was, in part, to facilitate the participation of minority business enterprises in the federally-funded railroad improvement projects.

Pursuant to authority granted under 905(d) and in light of the establishment of the MBRC, the Secretary promulgated regulations, 49 CFR § 265, *et seq.*, which provided for the establishment of affirmative action programs by the railroad recipients of 4–R Act funds and certain of their contractors in order to "insure that minorities and MBEs are afforded ample consideration with respect to employment and contractual opportunities produced as a result of the implementation of the Act...." *Id.* at 265.1. The regulations required that each funding agreement between a railroad and the federal government for financial assistance under the Act include a non-discrimination provision. *Id.* at 265.7. One clause to be included in these funding contracts provided that:

> The recipient shall not discriminate against any business organization in the award of any contract because of race, color, national origin or sex of its employees, managers or owners. Except as otherwise required by the regulations or orders of the Administrator, the recipient shall take affirmative action to insure that business organizations are permitted to compete and are considered for awards of contracts without regard to race, color, national origin or sex.

§ 265.7(v).

Even in the absence of prior discriminatory behavior a recipient of federal railroad funds was expected to

take affirmative action to insure that no person is excluded from participation in or denied the benefits of the project, program or activity on the grounds of race, color, national origin or sex, and that minorities and MBEs are afforded a reasonable opportunity to participate in employment and procurement opportunities that will result from financial assistance provided under the Rail Acts.

§ 265.7(5)

Sections 265.9–.13 required each recipient of federal funds under the Act to establish a detailed affirmative action program "to insure that ... minorities and MBEs receive a fair proportion of employment and contractual opportunities" created by the 4–R program. § 265.9

In their affirmative action plans recipients of the 4–R funds were required to identify specific actions which they would take to

> (ii) Provide for adequate and timely consideration of the availability and potential of MBEs in all procurement decisions;

> (iii) Assure that MBEs will have an equitable opportunity to compete for contracts, by arranging solicitation time for the preparation of bids, quantities, specifications, and delivery schedules so as to facilitate the participation of MBEs and by assisting MBEs who are potential contractors in preparing bid materials and in obtaining and maintaining suitable bonding coverage in those instances where bonds are required.

> * * * * * *

> (vi) Where appropriate because of prior underutilization of MBEs, establish specific goals and timetables to utilize MBEs in the performance of contracts awarded.

§ 265.13.[4]

The DOT's effort to ensure substantial MBE participation in the 4–R Act program

---

**4.** The regulations accompanying the 4–R Act also set up a procedure to ensure compliance with the affirmative action programs. § 265.-21(b) permitted "any person" to file a discrimi-

nation complaint with the Administrator of the Federal Railroad Administration (Administrator). The Administrator was to promptly investigate complaints. § 265.21(c). Instances of

was not an isolated instance of bureaucratic beneficence:

> It is the policy of the Department of Transportation to encourage and increase the participation of businesses owned and controlled by minorities, including women, (MBEs) in contracts and projects funded by the Department. Economically and socially disadvantaged individuals, including minorities and women, have traditionally been underrepresented as owners and managers of businesses in this country. The executive and legislative branches of the federal government have long recognized the need to promote the development of businesses owned by the economically and socially disadvantaged to achieve the goal of equal opportunity. To overcome the traditional underrepresentation of these groups in the business community, the federal government has used its procurement authority and its financial assistance programs to state and local governments as vehicles to assist minority business enterprises. Executive Order 11625 directs the Department of Commerce to provide technical and financial assistance to promote MBEs. Executive Order 11625 further requires that federal executive agencies develop comprehensive plans and programs to encourage minority business enterprise.

> \* \* \* \* \* \*

> The Department of Transportation is firmly committed to fulfilling its responsibilities under this Executive Order and to meet the goal of greater MBE participation in contracts and projects funded by the Department, although this may result in some increased cost to DOT. To this end, DOT is requiring each of its operating elements and all aid recipients and their contractors to make strong affirmative action efforts designed to set and meet goals for increasing MBE involvement. These efforts will encompass all aspects of the procurement of supplies, equipment, construction and services, including professional service contracts, concession contracts and bank deposits.

> \* \* \* \* \* \*

> The Department recognizes that meaningful gains in the level of MBE participation can be achieved only with energetic enforcement of this order and the commitment of all DOT employees, grantees and contractors to the goals of equal opportunity.

DOT Order 4000.7A.[5]

The DOT looked to Executive Order 11625 and Title VI of the Civil Rights Act

non-compliance were to be resolved, if at all possible, by informal means. § 265.21(d)(1). Where the non-compliance was substantial and/or informal methods of obtaining compliance were unavailing, the Administrator could cut off funding assistance temporarily. § 265.23(a). Continued non-compliance was grounds for the Administrator to permanently cut off financial assistance, refer the matter to the Attorney General for civil action, take action under Title VI of the Civil Rights Act or to take other appropriate steps. *Id.*

Persons receiving notice of substantial non-compliance could file a written response. § 256.23(c). The regulations also provided the option of an informal hearing on the non-compliance issue at the discretion of the Administrator. *Id.* Parties to the informal hearing could be represented by counsel and could present relevant material. *Id.* There was no similar provision for complainants. Exceptions to the hearing officer's decision could be filed with the Administrator. § 265.23(e)(2). If the Administrator found a party in non-compliance with the

anti-discrimination provisions of the 4–R Act and accompanying regulations, the Administrator was to cut off federal assistance, refer the matter to the Attorney General with a recommendation that an appropriate civil action be instituted, take action under Title VI and/or take other appropriate action. § 265.23(e)(3).

5. The following discussion of MBE participation in both the nation's economy and in federally-funded programs sheds some light on the DOT's extensive use of affirmative action programs:

*Current MBE Use*

The President, in his Urban Policy Statement, and the Secretary, in DOT Order 4000.7A, have both emphasized the vital role that MBEs are to play in direct Federal and Federally assisted contracting. To date, MBEs have not participated meaningfully in this contracting. While members of minority groups represent approximately 15.7% of the U.S. population according to the 1970 census, they own only 3% of the business in the United States. Statistics for women are even more disparate:

of 1964, among other provisions, as authority for its MBE development effort. In addition to the 4–R Act, DOT programs with affirmative action provisions include Section 30 of the Airport and Airway Development Act of 1970, 49 U.S.C. § 1730, the Urban Mass Transportation Act, 49 U.S.C. § 1615, and the Federal Highway Administration, 23 C.F.R. 230, Subpart B. *See also*, 49 C.F.R. § 23 *et seq.* (*Participation by Minority Business Enterprise in Department of Transportation Programs*). *Cf.* 42 U.S.C. § 6705(f)(2) (Public Works Employment Act).

This statutory scheme was modified but not changed in any important respect in early 1983. Congress repealed § 905 of the 4–R Act, 45 U.S.C. § 803, the non-discrimination provision, but replaced it with a nearly identical provision. 49 U.S.C. § 306.[6] Similarly, the statute creating the MBRC, 49 U.S.C. § 1657, was repealed and a nearly identical statute passed in its place. 49 U.S.C. § 332. The non-discrimination and affirmative action regulations promulgated under § 803(d) and summarized above have remained in effect. None of these statutory revisions appears to af-

fect any of the plaintiffs' substantive rights.

### Litigation History

As one of the conditions of their funding agreements with the Secretary of DOT and the FRA Administrator the defendant railroads agreed to comply with § 905 and accompanying regulations. They established detailed affirmative action plans which typically had as their goal 15 per cent MBE participation in 4–R Act funded projects.

On August 1, 1978, a group of minority businesses, including some of the plaintiffs, filed a formal complaint with the Secretary concerning the railroad defendants' non-compliance with the non-discrimination requirement and their affirmative action programs. The MBRC undertook a prompt investigation of the railroads' practices and submitted a report of its findings to the FRA in September 1978.

The results of the MBRC investigation supported most of the allegations that the railroad defendants were not in compliance with the affirmative action requirements of the 4–R Act.[7] The MBRC made findings in

---

while they comprise 51% of the population, they own only 4.6% of the businesses.

The statistics in terms of gross receipts also show disparity. For example, women-owned business receipts totaled only 0.3% of all U.S. business receipts in 1972, the most recently available figures. Despite Federal programs of the SBA, the Department of Commerce and others to assist firms owned by minorities, participation in Federally-assisted contracting is negligible. Moreover, these programs place little emphasis on women-owned firms.

In terms of dollars levels, the DOT financial assistance program is far more significant than direct DOT contracting. Unfortunately, MBE participation is at a low level in this program. Over the past three fiscal years, MBE participation has increased only from approximately 1% to 2% of all DOT financial assistance.

In FY 1979, DOT awarded grants of $13.3 billion. Of this amount, $350,455,000 went to minority contractors. In addition, awards of $90,355,000 were made to women-owned firms. This performance must be improved if the Department's goal of encouraging full participation by woman- and minority-owned firms is to be realized.

45 Fed.Reg. 21172, 21174 (1980) (codified at 49 C.F.R. § 23).

6. The current non-discrimination statute reads:

(b) A person in the United States may not be excluded from participating in, be denied the benefits of, or be subject to discrimination under, a project, program, or activity because of race, color, national origin, or sex when any part of the project program, or activity is financed through financial assistance under section 332 of this title [49 U.S.C.S. § 332], section 211 or 216 of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 721, 726) [45 U.S.C.S. §§ 721, 726], title V or VIII of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 821 *et seq.* 851 *et seq.*) [45 U.S.C.S. §§ 821 *et seq.*, 851 *et seq.*] or section 4(i) or 5 of the Department of Transportation Act (49 U.S.C. 1653(i), 1954) [49 U.S.C.S. §§ 1653(i), 1654].

49 U.S.C. § 306.

7. The capsule summary of the results of the investigation was as follows:

"The railroads have not instituted minority vendor programs to effectively achieve the goal of 15% minority participation in their procurement activity.

five major areas. First, the report noted that "many majority-owned and traditional suppliers to railroads are transferring stock in an attempt to be accorded preferential treatment as [MBEs]." This was accomplished by white male owners transferring stock to their wives or by stock transfers in the subsidiaries of majority-owned companies. The report found that "women-owned firms account for the vast majority of MBE procurement" by the defendant railroads. Investigators found that 80 to 90 per cent of the MBE suppliers of Milwaukee Road were white female-owned. The figure was 85 per cent for Illinois Central Gulf. The exact figure for Chicago & Northwestern was unknown but the "largest share" of its contacts with MBEs went to women-owned firms. The report concluded that the "utilization of 'women-owned' firms presents the opportunity for the railroads to achieve the required DOT goals with minimal change in current procurement practices."

The second finding of the MBRC report was that the defendant railroads "have done little to establish formal MBE development programs.... [A]lthough the railroads have committed to development of MBEs as suppliers, their activities toward implementation of this objective appear to be almost nonexistent." The report found that neither the railroads nor their buyers had made adequate efforts to initiate and maintain business contacts with MBEs. Such failures necessarily lessened the degree of MBE participation since the investigators found that 75 per cent of the railroad's procurement requests are initiated by buyers and negotiated over the telephone with two or three "known suppliers."

Third, the report found that the managements of the defendant railroads failed to implement policies which would ensure an effective MBE program. Investigators found that company officials had not impressed upon buyers the importance of the affirmative action program and in some cases had even displayed a negative attitude toward establishment of an effective program. In addition, the report noted inadequate recordkeeping as well as the failure to appoint senior corporate officials to monitor and develop the programs.

Fourth, the report found that "[t]he railroads have not developed specific procedures to monitor and evaluate the achievement of their suppliers toward established [affirmative action] goals." The regulations accompanying the 4–R Act required contractors receiving contracts over $50,-000 in federally-funded railroad projects to develop their own affirmative action plans. The existence of the plans were to be a condition of contracts entered into between the railroads and their large contractors. 49 C.F.R. § 265.11.

The fifth finding of the report was that "the railroads have not developed nor implemented formal procurement procedures to adequately improve communication between buyers and MBEs, or to support the achievement of established MBE participation goals."

On February 1, 1979, the FRA Administrator adopted the findings of the MBRC report in their entirety, but concluded that no specific instance of discrimination had been found:

"Though the railroads have established Affirmative Action Programs and goals in addition to issuing corporate policy relative to minority business programs, the railroads:

"a) lacked formal procedures for the effective communication of corporate commitment and policy down to the operating levels of the company

"b) failed to commit necessary managerial and other resources for the implementation of effective minority business programs

"c) failed to implement systems to adequately monitor and evaluate their progress toward minority vendor utilization goals and to report such progress to FRA/MBRC

"d) failed to develop an effective certification process to prevent unqualified firms from falsely claiming minority status

"e) failed to put in place a system to monitor the performance of their suppliers and contractors toward achievement of the latter's affirmative action goals

"f) failed to become fully familiar with and utilize MBRC programs designed to assist them in implementing effective MBE programs."

I have concluded the investigation and, pursuant to 49 CFR 265.21(d)(1) find that although no specific instance of discrimination has occurred, the [railroads have] failed, through a general pattern of certification abuse and poor program development, to comply with the general dictates of 49 CFR 265.9. This section requires that "recipients of financial assistance ... shall develop and maintain an affirmative action program to insure that ... minority businesses receive a fair proportion of ... contractual opportunities."

The Administrator ordered the defendant railroads to implement changes in their policies in order to increase the participation of legitimate MBEs in 4–R Act-funded programs. The railroads did not appeal the Administrator's decision and the FRA did not take steps to cut off 4–R funds as it was permitted to do under 45 U.S.C. § 803(b)(2)(A).

Before FRA rendered its decision, some of the plaintiffs herein instituted a class action in federal district court against the Secretary of the DOT, the FRA Administrator and the railroads named in the present complaint. The action was brought pursuant to 42 U.S.C. §§ 1981, 1982, 1983 and the 4–R Act, and sought a declaratory judgment that the plaintiffs were entitled to greater participation in the federally-assisted programs as well as an injunction ordering the Department of Transportation to cut off federal funds until the railroads complied with the 4–R Act and accompanying regulations.

On defendants' motions to dismiss, Judge Bua held that the plaintiffs did not have an independent private right of action to enforce the anti-discrimination provisions of the 4–R Act via a funding cut-off because the Act provided an adequate administrative remedy, including judicial review of administrative decisions, that the plaintiff had not yet exhausted. *Fizer, et al. v. Adams, et al.*, No. 78 C 5042 (N.D.Ill. April 9, 1979). He held further that plaintiffs must exhaust the 4–R Act's administrative remedies before proceeding with their § 1981 claims. Slip op. at 22–27. The

court also held that plaintiffs had failed to state claims under 42 U.S.C. §§ 1982 and 1983, finding that § 1982 "simply has no application to the present circumstances," and that plaintiffs had failed to allege the requisite state action in their § 1983 count. Slip op. at 22, n. 15.

The Seventh Circuit, in an unpublished order, declined to decide whether plaintiffs stated a claim against the railroads under § 1981 because the complaint sought no relief against those defendants. *Fizer v. Adams*, No. 79–1448, slip op. at 3 (7th Cir. April 25, 1980) (unpublished). With respect to plaintiffs' §§ 1982 and 1983 claims, the Court simply said, "There is nothing in the complaint which could possibly support a claim for relief under § 1982 or § 1983." *Id.* at 4. On the question of a private right of action under the 4–R Act against the federal defendants to cut off funds, the Court affirmed the dismissal of the complaint, saying, "Congress has pretty solidly indicated its intent that the relief which plaintiffs seek here is committed to administrative decision in the first instance, subject to judicial review." *Id.* at 10. The Court declined to decide whether the 4–R Act grants plaintiffs a private right of action against the railroad defendants because plaintiffs did not request anything other than declaratory relief against those defendants. *Id.* at 4–5.

While the Seventh Circuit appeal was pending, the plaintiffs in the original lawsuit and other black- or Hispanic-controlled businesses brought the present action solely against the railroad and contractor defendants. The Seventh Circuit noted this development and said, "The dismissal [of the original lawsuit] does not foreclose relief on the claims in the [new] action." Slip op. at 5, n. 5.

### The Amended Complaint and Pending Motions

In count I of their first amended complaint plaintiffs charge that the defendant railroads violated the Civil Rights Act of 1870, 42 U.S.C. 1981, which provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . .

Plaintiffs allege that the defendant railroads have subjected them to discriminatory treatment through the refusal and failure to extend bid invitations and to make timely responses to inquiries about business opportunities, as well as through the arbitrary rejection of plaintiffs' bids. Plaintiffs further allege that the railroads "have systematically, knowingly, wrongfully and in bad faith failed and refused to enter into contracts with MBEs and have excluded such MBEs from full participation in the procurement programs funded in whole or in part through financial assistance made available under the 4–R Act. . . ."

In count II plaintiffs claim a violation of their rights under the Civil Rights Act of 1866, 42 U.S.C. § 1982, which states:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property.

The basis of this claim is an allegation that the railroads systematically excluded the plaintiffs from full participation in 4–R Act-funded programs.

Count III of the complaint alleges a violation of the non-discrimination provision of the 4–R Act, 45 U.S.C. § 803(a). The heart of the count is an allegation that

the defendant railroads have, continue and will continue to expend millions of dollars in funding assistance provided for disbursement to minority business enterprises under 45 U.S.C. §§ 801, et seq., to white male-owned and/or controlled business firms. Many of said white male-owned and/or controlled business firms have, with the full knowledge of the defendant railroads, fraudulently repre-

sented themselves to be minority business enterprises by various techniques, including, but not limited to, manipulation of stock ownership and false designation of corporate officers. The purpose of said conduct is to further deny benefits to legitimate minority business enterprises."

Plaintiffs also allege that they have exhausted all available avenues of administrative relief.

Count IV is a contract claim. Plaintiffs charge that the railroad defendants breached the provision in the funding agreements which required the railroads to practice non-discrimination and to achieve 15 per cent MBE participation in the 4–R procurement program. They seek relief on a third-party beneficiary theory.

Count V is brought against the railroad and contractor defendants under the Clayton Act, 15 U.S.C. §§ 15 and 26 to recover treble damages for violations of Section One of the Sherman Act, 15 U.S.C. § 1. The plaintiffs allege that the defendants conspired to exclude and eliminate members of plaintiffs' class from competing for procurement contracts granted by the railroads. According to the complaint "the defendant railroads engaged in a concerted refusal to deal with plaintiffs and members of the plaintiff class, and did otherwise boycott plaintiffs and members of the plaintiff class from obtaining business from the defendant railroads." The complaint further alleges that the defendant contractors furthered the boycott by engaging in manipulation of stock ownership and false designation of corporate officers in order to qualify as MBEs. Finally, plaintiffs allege that defendants' actions had virtually excluded members of the plaintiff class from competing for railroad procurement contracts causing substantial and irreparable damage to their business and property.

Count VI is directed against the contractors. It alleges they conspired with each other to tortiously interfere with the affirmative action provisions in the funding agreements between the DOT and the rail-

roads. The complaint points to a chameleon-like transformation of white male-owned businesses into MBEs as the linchpin of the conspiracy.

In count VII plaintiffs charge both the railroad and the contractor defendants with engaging in a common law conspiracy to violate 42 U.S.C. §§ 1981 and 1982. An allegation that the contractors falsely and fraudulently held themselves out as minority vendors is also the basis of this count.

The MBRC report, summarized above, was incorporated as an integral part of the complaint. Under counts I through III plaintiffs seek an injunction against the railroad defendants, restraining them from continued discrimination against minority businesses. They also request compensatory damages in the amount of $11,400,000 and punitive damages in the amount of $22,800,000 for each year that the railroad defendants received assistance under the 4–R Act. In count IV they seek the same amount of compensatory damages and specific performance of the railroad defendants' affirmative action obligations under their funding agreements with DOT and FRA. Under count V they request treble damages and an injunction against defendants' continued violation of the antitrust laws. In counts VI and VII they seek compensatory and punitive damages in the above-mentioned amounts.

### Pending Motions

The railroad defendants have moved for dismissal of the complaint. The contractor defendants have moved for dismissal and/or for summary judgment. Following is a breakdown of the theories upon which defendants base their various motions:

1. Plaintiffs have no standing to sue because

 a. neither OMVI nor the minority businesses have alleged injury in fact (all defendants);

 b. corporations have no racial identity and therefore cannot be subjected to racial discrimination (all defendants); and

 c. plaintiffs have not alleged a competitive relationship under the antitrust laws (some contractor defendants).

2. The complaint does not meet the specificity requirements of Fed.R.Civ.P. 8 and 9(b) (all defendants).

3. Count I fails to state a claim because § 1981 does not require affirmative action efforts (railroad defendants).

4. Count II does not state a claim because plaintiffs' anticipated contracts with the railroad defendants are not properly within the meaning of § 1982 (railroad defendants).

5. Plaintiffs have no private right of action to enforce the non-discrimination or affirmative action requirements of the 4–R Act and if they do, the Administrator of FRA is an indispensable party to the extent that plaintiffs seek a cut-off of federal funds (railroad defendants).

6. Count IV fails to state a claim because plaintiffs are not intended beneficiaries of the funding contracts (railroad defendants).

7. Count V fails to state a claim because

 a. plaintiffs have not alleged that they are competitors (contractor defendants and railroad defendants);

 b. plaintiffs have not alleged that the railroads have monopoly buying power (railroad defendants);

 c. the antitrust laws were not intended to reach claims of racial discrimination (contractor defendants).

8. Count VI fails to state a claim because

 a. there are no contracts between plaintiffs and the railroads with which the contractors could interfere (contractor defendants); and

 b. plaintiffs are not parties to or intended beneficiaries of the contracts between the railroad defendants and DOT and FRA (contractor defendants).

9. Count VII fails to state a claim because

a. there is no common law cause of action for conspiracy (railroad defendants); and

b. to the extent count VII is brought pursuant to 42 U.S.C. § 1985, plaintiffs must allege racial discrimination, which, being corporations, they cannot (railroad defendants).

10. Plaintiffs' allegations of defendants' failure to meet their obligations under affirmative action plans are not actionable under the Civil Rights Acts (railroad defendants).

11. Some contractor defendants are entitled to summary judgment either because they are legitimate minority business enterprises or because they never held themselves out to be such (contractor defendants).

The court will address these arguments, though not in exact order, in the discussion below.

### Standing

■ Defendants have challenged the standing of OMVI and the individual corporate plaintiffs to maintain this action. The concept of standing subsumes both constitutional requirements and prudential considerations. *Valley Forge Christian College v. American United for Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). In order to meet the Article III standing requirement the plaintiff must meet three tests. First, the plaintiff must show that *it* suffered an injury in fact. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Second, there must be some "fairly traceable" causal connection between the injury complained of and the challenged behavior of the defendant. *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Third, there must be some indication that the relief requested by the plaintiff will redress its injury. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

■ Once it is clear that the plaintiff has met these constitutional requirements the court must weigh several prudential considerations before it finds that the plaintiff has standing. The first consideration is that plaintiff's complaint must fall "arguably within the zone of interests to be protected or regulated by the statute ... in question." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *South East Lake View Neighbors v. Department of Housing and Urban Development*, 685 F.2d 1027, 1034 (7th Cir.1982). The second prudential consideration stems from the reluctance of the federal courts to decide "abstract questions of wide public significance even though other governmental institutions may be more competent to address the question...." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). A final prudential consideration is that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 499, 95 S.Ct. at 2205.

In weighing a motion to dismiss for lack of standing, a district court must assume as true all material facts alleged in the complaint and must construe the pleadings in the plaintiff's favor. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 109 n. 22, 99 S.Ct. 1601, 1613 n. 22, 60 L.Ed.2d 66 (1979). As the Seventh Circuit recently emphasized:

Questions of standing deal exclusively with whether the plaintiff alleged facts satisfying the constitutional and prudential limitations of the doctrine. The ability of the complaint to survive a summary judgment motion or support an award in law or equity after a full trial is irrelevant. The proper focus is upon the plaintiff and whether his interest in the controversy is significant enough to justify the exercise of federal judicial power on his behalf.

*South East Lake View Neighbors*, 685 F.2d at 1034 (citations omitted).

### 1. *Individual Corporate Plaintiffs*

The individual corporate plaintiffs qualified as minority business enterprises under Department of Transportation regulations, 49 CFR § 265.5(j). The corporations are engaged in a wide variety of business activities and supply the kinds of goods and services commonly purchased by the defendant railroads and/or supplied by the contractor defendants.

A theme running through the seven counts of the complaint is that the corporate plaintiffs suffered substantial economic injury as a result of the actions of the railroad and contractor plaintiffs. Counts I, II and VII allege economic injury as a result of racial discrimination against the plaintiff class. Count III alleges economic loss as a result of defendants' failure to comply with the non-discrimination and affirmative action provisions under the 4–R Act. Counts IV and VI focus on the plaintiffs' loss of business opportunities in 4–R Act funded projects resulting from breaches of affirmative action provisions in the funding agreements entered into between the railroads and the federal government. Count V alleges economic damages from an illegal boycott of plaintiffs' products and services by the defendants.

■ An Art. III injury in fact is a bona fide injury, however small. *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), *South East Lake View Neighbors*, 685 F.2d at 1033. Plaintiffs have certainly alleged such a "perceptibl[e] impair[ment]." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982).

■ The corporate plaintiffs also have shown that there is a causal connection between their injuries and defendants' behavior. In *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), the plaintiffs attacked restrictions on the treatment of indigents by local hospitals by seeking to enjoin federal officials from making changes in tax laws which allegedly fostered the restrictions. The Court found that the defendants had no standing and implied that the proper parties to sue were the offending hospitals. *Id.* at 41, 96 S.Ct. at 1925. The plaintiffs' first action was similarly directed primarily at the federal government and sought a cut-off of 4–R funding for the defendant railroads. In contrast, the complaint in this action is directed against the parties who allegedly discriminated against the plaintiffs, and thus states a sufficient causal connection for standing purposes.

It is self-evident that the remedies sought by the plaintiff—compensatory damages and injunctive relief—would do much to redress any economic injury already suffered by the plaintiffs as well as serve to prevent future injury.

■ The most serious challenge to the standing of the individual corporate plaintiffs is rooted in the prudential consideration that the plaintiffs' injury must fall within the zone of interests protected by statute or constitutional provision. *Valley Forge*, 454 U.S. at 475, 102 S.Ct. 760. Defendants challenge plaintiffs' standing in this regard in several areas. First, they assert that corporations can have no racial identity under civil rights laws and thus the individual corporate plaintiffs have no standing to bring counts I, II, and VII. They cite a one-line dictum from *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977), that "[a]s a corporation, [Metropolitan Housing Development Corporation] has no racial identity and cannot be the direct target of petitioner's alleged discrimination." This language does not foreclose the possibility that some corporations, like the plaintiffs, which have been identified as minority business enterprises under federal regulations, do have a "racial identity" and can be targets of discrimination. Further, several post-*Arlington Heights* decisions which have considered the issue have found that corporations can maintain civil rights actions. *See Hudson Valley Theatre, Inc. v.*

*Heimbach,* 671 F.2d 702 (2d Cir.1982) (Friendly, J.), *cert. denied,* 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110 (1982); *Marshall v. Kleppe,* 637 F.2d 1217 (9th Cir. 1980); *Howard Sec. Servs. v. Johns-Hopkins Hospital,* 516 F.Supp. 508 (D.Md. 1981); *T & S Service Associates v. Crenson,* 505 F.Supp. 938 (D. RI 1981), *vacated on other grounds,* 666 F.2d 722 (1st Cir. 1981). *See generally,* Note, *Corporate Standing to Allege Race Discrimination in Civil Rights Actions,* 69 Va.L.Rev. 1153 (1983).

■ Second, they assert that the individual corporate defendants have failed to allege that they have suffered an "antitrust injury," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), and thus lack standing to bring count V. As members of a class which was allegedly the target of an illegal boycott by the defendants, the individual plaintiffs have alleged an antitrust injury sufficient to confer standing.

Third, they claim that plaintiffs are not third-party beneficiaries of the affirmative action agreements and thus lack standing to bring counts IV and VI. We reject this argument for the reasons stated in the discussion of plaintiffs' third-party beneficiary claim, *supra.*

■ The other prudential considerations have little weight here. The claimed economic injury is neither a "generalized grievance" nor an "abstract question of wide public significance." *Warth, supra.,* 422 U.S. at 499–500, 95 S.Ct. at 2205–2206. Plaintiffs allege that the injury is theirs; they are not pressing their claims on behalf of others. Consequently, we hold that the individual corporate plaintiffs have standing to pursue all seven counts of this action.

## 2. *OMVI*

■ Separate standing rules have developed for associations. These rules are complementary to the standing rules applicable to individuals. *See e.g., Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). First, an organization has standing if it has suffered an injury in fact as the result of defendant's challenged behavior. For example, in *Hunt,* the alleged injury to a state advertising agency was the drop in annual assessments used to fund the agency which was caused by a decline in the volume of Washington apples sold, 432 U.S. at 345, 97 S.Ct. at 2442. In *Havens,* the defendants' racial-steering practices required the plaintiff fair housing organization to devote significant resources identifying and correcting the defendants' practices. 455 U.S. at 378–79, 102 S.Ct. at 1124–25. The Supreme Court found that both organizations had standing to seek damages as a result.

In contrast, an injury to an organization's "abstract social interests" is not enough to confer standing. For example, the organization plaintiff in *Simon v. Eastern Kentucky Welfare Rights Organization* was "dedicated to promoting access of the poor to health services." 426 U.S. at 39–40, 96 S.Ct. at 1924–1925. An alleged furthering of the practice of denying indigents health care by changes in the tax laws was not enough by itself to confer standing.

■ Plaintiffs have failed to allege that defendants' practices have caused any injury-in-fact to OMVI. OMVI lacks standing in its own right, for example, to maintain the antitrust claim because the organization does not fall within the "target area" of defendants' alleged boycott. *In re Industrial Gas Antitrust Litigation,* 681 F.2d 514 (7th Cir.1982), *cert. denied,* — U.S. ——, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983). There is likewise no indication that OMVI's income or expenditure levels were affected by defendants' alleged dis-

crimination. OMVI's relatively general interest in furthering the economic and civil rights of its members is not enough to prompt the court to imply an injury in fact.

If an organization lacks standing in its own behalf it may nevertheless have standing derivatively as a representative of its members. *Warth v. Seldin,* 422 U.S. at 511, 95 S.Ct. at 2211; *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. at 342–43, 97 S.Ct. at 2440–41. In order to have such standing:

> The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make a justiciable case had the members themselves brought suit. So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

*Warth,* 422 U.S. at 511, 95 S.Ct. at 2211 (citation omitted). Later cases have identified three requirements for associational standing: (1) individual members must otherwise have standing; (2) the interests sought to be protected are germane to the organizational purposes, and (3) neither the claim asserted nor the relief requested require the participation of individual members. *See Hunt v. Washington State Apple Advertising Commission,* 432 U.S. at 343, 97 S.Ct. at 2441; *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, U.A.W. v. Johnson,* 674 F.2d 1195, 1200 (7th Cir.1982).

OMVI members who fall within the plaintiff class have standing to bring this suit. The interests which OMVI seeks to protect are germane to its organizational purpose of furthering the civil rights and economic interests of its members. The individualized participation of members is, however, necessary for an accurate allocation of damages. The damage claims in this case

are "not common to the entire membership, nor shared by all in equal degree." *Warth,* 422 U.S. at 515, 95 S.Ct. at 2213. Consequently, OMVI lacks standing to assert damage claims. Because the individualized participation of the OMVI members is not necessary for the court to fashion injunctive relief, OMVI does have standing to seek injunctive relief on all counts. *See Id.* at 515, 95 S.Ct. at 2213. *See also Mission Hills Condominium Association M–1 v. Corley,* 570 F.Supp. 453 (N.D.Ill.1983) (associations can have standing under Section 16 of Clayton Act; regular associational standing analysis used); *National Office Machine Dealers v. Monroe, The Calculator Co.,* 484 F.Supp. 1306 (N.D.Ill.1980).

### Specificity of the Complaint

The defendants also seek dismissal of this action on the ground that the various counts of the complaint lack sufficient specificity. Section 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Interpreting this provision in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), a unanimous Supreme Court embraced notice pleading and stated that the "Federal Rules do not require a claimant to set out in detail the facts upon which he bases his claim." An action may be dismissed for failure to state a claim only if it "appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 45–46, 78 S.Ct. at 101–102. *See Stern v. U.S. Gypsum,* 547 F.2d 1329, 1332 (7th Cir. 1977), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977).

In the introduction we described at length the allegations of the complaint as well as the MBRC report, which was incorporated into it by reference. This was done in order to show the basis for this court's conclusion that the plaintiffs have stated their claims with sufficient specificity to survive a motion to dismiss. The allegations of the complaint, when coupled

with the findings of the MBRC report, are sufficient to put all of the defendants on notice as to the wrongs complained of, the parties involved, and the relief sought. Plaintiffs' complaint certainly is no model of specificity. Nor will proof of the accuracy of the finding of the MBRC report alone be enough for them to succeed on all counts. The report, however, gives enough specific factual support to plaintiffs' claims so that dismissal would be inappropriate. Defendants also argue that plaintiffs' complaint should be measured against the stricter pleading requirements of Rule 9 of the Federal Rules of Civil Procedure because plaintiffs have alleged that defendant contractors "fraudulently" changed their corporate structure in order to qualify as MBEs. Plaintiffs, however, are not bringing a cause of action for fraud. Rather, they are alleging that a transformation of the traditional railroad suppliers into MBEs was part of an effort to discriminate against the plaintiffs in the railroad supply market. We also hold that the plaintiffs' various conspiracy allegations, when read in the context of the entire complaint, satisfy the Rule 9 pleading requirements.

*Motions to Dismiss the Complaint*

1. *Count I: The 42 U.S.C. § 1981 Claim*

 The defendant railroads seek dismissal of count I on the ground that it is based on their failure to meet their affirmative action goals and not on any intentional discrimination against the plaintiffs. Defendants are correct that in order to proceed in a § 1981 action plaintiff must allege intentional discrimination. *Mescall v. Burrus,* 603 F.2d 1266, 1271 (7th Cir. 1979). Plaintiffs have done so in paragraphs 17 and 18 of the complaint.

This court reads count I as alleging more than simply that the defendants' failure to achieve their affirmative action goals constituted a § 1981 violation. Rather, it views the complaint as pointing to defendants' failure to meet affirmative action goals, alleged acquiescence in the deceptive certification of established suppliers as MBEs, and other shortcomings detailed in the MBRC report as support for its claim that the railroads intentionally discriminated against the plaintiff class. Under established pleading standards, count I easily survives the motion to dismiss.

The cases cited by defendants in support of their argument are not apposite. The court in *Long v. Ford Motor Co.,* 496 F.2d 500 (6th Cir.1974), overturned a ruling that Ford's failure to provide special job training for a black plaintiff to compensate for the effects of past discrimination violated § 1981. In this case plaintiffs are not arguing for the creation of an affirmative action program for 4–R funded projects or that the absence of such a program violates § 1981. Congress has already determined that assistance to MBEs, including affirmative action programs, is necessary to increase MBE participation in federally-funded railroad projects. *Cf. Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). The railroad defendants have set up their affirmative action programs. Plaintiffs are simply asserting that the reasons for defendants' failure to meet their affirmative action goals point to a practice of intentional discrimination. *Waters v. Wisconsin Steel Works of International Harvester Co.,* 502 F.2d 1309 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976) involved the very different issue of whether a last hired/first fired seniority system violated § 1981. The court in *Louis v. Pennsylvania Industrial Development Authority,* 371 F.Supp. 877 (E.D.Pa.1974), *aff'd* 505 F.2d 730 (1974), *cert. denied,* 420 U.S. 993, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975), rejected a § 1981 claim in small part because the fact that two of a contractor's affirmative action plans had been turned down by the federal government did not alone constitute proof of intentional discrimination. That decision is not determinative here where the railroads' failure to meet their affirmative action goals is but one allegation supporting plaintiffs' claim that they were subjected to intentional discrimination.

2. *Count II: The 42 U.S.C. § 1982 Claim*

 Section 1982 of the Civil Rights Act reads:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property."

42 U.S.C. § 1982. While the language of § 1982 that citizens have the "same right ... [to] sell ... and convey real and personal property" seems to cover plaintiff's claim, there appears to be no support in the case law for a § 1982 action in this case. The reach of § 1982 is broad. *Haythe v. Decker Realty Company*, 468 F.2d 336, 338 (7th Cir.1972). Nevertheless, § 1982 may be limited to protecting the right of black citizens to acquire property and to hold the same "bundle of rights" in property as do white citizens. *Jones v. Alfred H. Mayer, Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), *Tillman v. Wheaton-Haven Recreation Association*, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). Perhaps the ability to convey property with the same ease as white citizens is part of the bundle of property rights protected by § 1982. Plaintiffs have not relied upon such a theory and we decline to reach its merits. Nor have plaintiffs pointed us to any cases where the refusal to buy products or services from a black citizen constituted a § 1982 violation and in the absence of such precedent we decline to apply § 1982 to the allegations in this case. Consequently, count II of the complaint is dismissed.

### 3. *Count III: The 4–R Act Claim*

The railroad defendants have moved to dismiss count III of the complaint on four grounds: (1) the 4–R Act does not create a private right of action; (2) the railroads' alleged failure to meet affirmative action goals set forth in the funding agreements with DOT does not constitute a violation of the non-discrimination provisions of the 4–R Act, 45 U.S.C. § 803(a); (3) the allegations of count III do not satisfy the requirements of Fed.R.Civ.P. 8; and (4) plaintiffs have failed to join the federal government as an indispensable party. Since the faulty pleading argument has already been considered and rejected with respect to the complaint as a whole, the court will consider only those contentions directed specifically toward plaintiffs' 4–R Act claims.

### A. *Private Right of Action under the 4–R Act*

■ Whether the 4–R Act creates an implied private right of action in favor of plaintiffs is more properly dissected into two discrete and analytically distinct questions. First, can the existence of a private cause of action be inferred from the language, legislative history, and purpose of the statute in question? *See Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[8] Second, if there is a private cause of action, what remedies are available to the private plaintiff? *See Davis v. Passman*, 442 U.S. 228, 239, 99 S.Ct. 2264, 2273, 60 L.Ed.2d 846 (1979); *Lieberman v. University of Chicago*, 660 F.2d 1185 (7th Cir. 1981), *cert. denied*, 456 U.S. 937, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). We need only address the first question at this point.

There can be little doubt that § 905 of the 4–R Act creates an implied private right of action in favor of these plaintiffs. The language of § 905 explicitly confers a right to be free of discrimination on a class of persons to which these plaintiffs belong. Indeed, when one moves beyond § 905 to consider the accompanying regulations it becomes clear that MBEs in particular

---

**8.** The Supreme Court has identified four factors which are especially relevant when determining whether a private remedy is implicit in a statute not expressly providing one:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?"

*Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (citations omitted).

were singled out not just for protection against discrimination but also for substantial affirmative action on their behalf by the recipients of 4–R Act funds. As the Supreme Court stated in *Cannon v. University of Chicago*, 441 U.S. 677, 690 n. 13, 99 S.Ct. 1946, 1954 n. 13, 60 L.Ed.2d 560:

> Not surprisingly, the right- or duty-creating language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action. With the exception of one case, in which the relevant statute reflected a special policy against judicial interference, this Court has never refused to imply a cause of action where the language of the statute explicitly conferred a right directly on a class of persons that included the plaintiff in the case. (Citations omitted.)

In *Cannon,* the Court was examining Title IX of the Education Amendments of 1972, 20 U.S.C. 1681, *et seq.,* which contains non-discrimination language identical in all relevant parts to that of the statute in question here.[9] Title IX also provides for the same type of administrative enforcement mechanism found in § 905 of the 4–R Act. That is, the federal agency extending financial assistance has the power to terminate funding if the recipient fails to comply with the non-discrimination provisions of the statute or the requirements of the regulations issued thereunder. 20 U.S.C. § 1682. Title IX and § 905 of the 4–R Act are also similar in that they both provide for judicial review of any agency action to enforce the non-discrimination requirements. 20 U.S.C. § 1683; 45 U.S.C. § 803(e).

The *Cannon* Court also examined the legislative history of Title IX. 441 U.S. at 694–703, 99 S.Ct. 1956–1961. It concluded that Congress intended Title IX to be inter-

preted in the same manner as Title VI, which had consistently been construed by the courts as creating a private remedy. Plaintiffs here have not pointed to any legislative history similar to that found in Title IX which would support an inference of congressional intent to create such a right. However, as the *Cannon* Court noted, where " 'it is clear that federal law has granted a class of persons certain rights, it is not necessary to show [in the legislative history] an intention to *create* a private cause of action, although an explicit purpose to *deny* such a cause of action would be controlling.' " 441 U.S. at 694, 99 S.Ct. at 1956 (quoting *Cort v. Ash,* 422 U.S. 66, 82, 95 S.Ct. 2080, 2090, 45 L.Ed.2d 26 (1975) (emphasis in original)). In light of the virtual identity of the non-discrimination language in Title VI, Title IX, and the 4–R Act and the fact that § 905 expressly refers to the enforcement mechanisms of Title VI, *see* fns. [3,4], *supra,* this court concludes that congressional silence on the existence of a private remedy under the 4–R Act indicates only that Congress felt no need to stress the availability of such a right of action. By modeling § 905 after a non-discrimination provision which gave private plaintiffs a cause of action against funding recipients Congress evidently believed that the legal context of the 4–R Act provided eloquent enough support for the implication of a private right of action under § 905.

As in *Cannon,* there is no basis for finding that a private remedy would frustrate the underlying purpose of the 4–R Act. The non-discrimination provision of the 4–R Act embodied DOT's policy of ending discriminatory practices in federally funded transportation projects. Section 905 of the 4–R Act was designed to protect "person[s]" against discriminatory prac-

---

**9.** Section 901(a) of Title IX provides:

"No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ...."

Courts have also found an implied right of action under Section 504 of the Rehabilitation Act, 29 U.S.C. 794, which contains a non-discrimination clause almost identical to § 905 of

the 4–R Act. *See Kling v. County of Los Angeles,* 633 F.2d 876 (9th Cir.1980); *Tatro v. State of Texas,* 625 F.2d 557 (5th Cir.1980); *NAACP v. The Medical Center, Inc.,* 599 F.2d 1247 (3d Cir.1979); *Leary v. Crapsey,* 566 F.2d 863 (2d Cir.1977); *United Handicapped Federation v. Andre,* 558 F.2d 413 (8th Cir.1977); *See also Lloyd v. Regional Transportation Authority,* 548 F.2d 1277 (7th Cir.1977).

tices, suggesting that Congress sought to provide protection to individual citizens, as it had in Title VI and Title IX. There is also no indication that implying a federal remedy here would be inappropriate because the subject matter of the 4–R Act is primarily of concern to the states. The federal government is funding the 4–R Act programs and has long led national efforts to end invidious discrimination. *See Cannon,* 441 U.S. at 708–09, 99 S.Ct. at 1963–64.

Defendants' argument that the unpublished order in *Fizer v. Adams, supra,* precludes implication of a private right of action in this case against these defendants is unpersuasive. The Seventh Circuit viewed plaintiffs' earlier complaint as seeking relief solely from the Secretary of the DOT and the Administrator of the FRA and explicitly cautioned that "any implication in the decision of the district court that plaintiffs would have no direct remedy against the railroad defendants for violation of 45 U.S.C. § 803(a) is not binding or effective in other cases." Slip. op. at 5. The Seventh Circuit was also cognizant of the fact that the Supreme Court had, in *Cannon,* implied a private right of action against *recipients* of federal funds, and noted that *Fizer,* unlike *Cannon,* sought

relief only against the *providers* of financial assistance. *Id.* at 4, n. 3. The *Cannon* court did discuss this distinction in its analysis of Title VI:

> In its final form, § 601 [declaring an absolute individual right not to have federal funds spent in aid of discrimination] was far more conducive to implication of a private remedy against a discriminatory recipient than was the original language, but at the same time was arguably *less* conducive to implication of a private remedy against the Government (as well as the recipient) to compel the cut-off of funds. Although willing to extend private rights against discriminatory recipients, the government may not have been anxious to encourage suits against itself.

441 U.S. at 716 n. 51, 99 S.Ct. at 1967 n. 51 (emphasis in original). This court thus concludes that *Cannon* is persuasive authority for implying a private right of action under § 905 of the 4–R Act. The only other court to consider the issue has reached the same conclusion. *Mikkilineni v. United Engineers & Constructors,* 485 F.Supp. 1292, 1295–97 (E.D.Pa.1980).

■ At this point we need not delineate precisely what relief is available to the plaintiffs.[10] Their prayer for an injunction against the railroad defendants' continued

---

**10.** The difficult question this court may face is whether plaintiffs can obtain monetary relief for past violations of the 4–R Act. Lower courts that have examined statutory language similar to the non-discrimination provisions of the 4–R Act have divided on the question of whether it provides a primate damages remedy. A close reading of the recent Supreme Court decision, *Guardians Association v. Civil Service Commission of the City of New York,* —— U.S. ——, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), suggests that plaintiffs are probably only entitled to damages for intentional violations of the non-discrimination section of the 4–R Act. In that case the district court held that proof of discriminatory effect was enough to establish a violation of Title VI and ordered compensatory remedies. The Second Circuit reversed on the ground that proof of discriminatory intent was necessary. A badly splintered Supreme Court affirmed the Court of Appeals on the grounds that private Title VI plaintiffs were not entitled to compensatory relief absent proof of discriminatory animus (Justices White and Rehnquist), there is no private right of action under Title VI (Justice

Powell and Chief Justice Burger), and Title VI requires a showing of intentional discrimination (Justice O'Connor).

Six members of the Court addressed directly the issue of the scope of remedies under Title VI. Justice White, joined by Justice Rehnquist, noted that under *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946) "[t]he usual rule is that where legal rights have been invaded and a cause of action is available, a federal court may use any available remedy to afford full relief." 103 S.Ct. at 3228. He concluded, however, that in most cases "declaratory and limited injunctive relief should be the only available private remedies for Title VI violations." This exception to the *Bell* rule was justified for two reasons, in Justice White's opinion. First, under the rationale of *Pennhurst State School v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), "make whole" remedies are inappropriate in private actions for violations of conditions placed on the receipt of federal funds under Spending Clause legislation. Such remedies fail to "respect the privilege of the recipient of federal funds to withdraw and terminate its

receipt of federal funds is, however, untenable. This request is simply the flip side of the relief sought in plaintiffs' previous suit against the FRA Administrator and the Secretary of DOT. In that action plaintiffs sought an order enjoining the *federal* defendants from *distributing* funds. Here, they want to enjoin the *private* defendants from *receiving* those funds.

The Seventh Circuit, in rejecting plaintiffs' earlier action against the federal defendants for failure to exhaust administrative remedies, said, "The complaint ... was not cast in terms of judicial review under 45 U.S.C. § 803(e) and, if it had been, was premature, being brought before the Administrator had completed final action." *Fizer v. Adams*, slip op. at 7. In analyzing

receipt of federal money rather than assume the further obligations and duties that a court has declared are necessary for compliance." *Id.* 103 S.Ct. at 3229. Second, Justice White found that there was nothing in the legislative history of Title VI to rebut the Pennhurst prohibition against damage remedies for unintentional violations of the conditions placed upon the receipt of funds under Spending Clause legislation. *Id.* at 3232.

In at least three places in his opinion, however, Justice White expressly limited the reach of his conclusion that Title VI remedies only included injunctive relief to instances where the discrimination was unintentional. For example, he stated that "in the absence of proof of discriminatory animus, compensatory relief should not be awarded to private Title VI plaintiffs; unless discriminatory intention is shown, declaratory and limited injunctive relief should be the only available private remedies for Title VI violations." 103 S.Ct. at 3232. *See also id.* at 3223, 3232.

Just as important as this language was Justice White's reason for limiting his conclusion to cases of unintentional discrimination. He stated that "[i]n cases where intentional discrimination has been shown, there can be no question as to what the recipient's obligation under the program was and no question that the recipient was aware of that obligation." 103 S.Ct. at 323. Thus, the Pennhurst rationale that a damage remedy is an after-imposed condition on Spending Clause funding agreements is simply inapplicable in case of intentional discrimination.

Justice White in effect employed a syllogism in Guardians Association: Pennhurst created a presumption against compensatory remedies because such remedies are in effect burdensome additional obligations; nothing in the legislative history rebutted this presumption; hence, private Title VI plaintiffs cannot obtain compensatory relief. He then suggested that the Pennhurst presumption was inappropriate in cases of intentional discrimination, 103 S.Ct. 3329–30 and fn. 20; hence, compensatory damages should be available for intentional violations in the absence of contrary legislative intention.

Four justices attacked Justice White's restriction on the Title VI damage remedy. Justice Marshall concluded that a damage remedy should be available for all Title VI violations, regardless of whether they were intentional or not. 103 S.Ct. at 3244 (Marshall, J., dissenting).

Justice Stevens, joined by Justices Brennan and Blackmun, considered it "settled by now that Title VI authorizes appropriate relief, both prospective and retroactive, to victims of racial discrimination at the hands of recipients of federal funds ...." *id.* at 3251 (Stevens, J, dissenting), and faulted Justice White's "novel conclusion" as both improperly based on Pennhurst and reflective of no legislative intent to the limit available remedies. *Id.* at 3250–3252.

Justice O'Connor did not address the question of whether there is a private cause of action under Title VI for damages upon a showing of intentional discrimination. 103 S.Ct. 3237, n. 1 (O'Connor, J, concurring). Justice Powell, joined by Chief Justice Burger, filed a concurring opinion which argued that there is no private right of action under Title VI. 103 S.Ct. at 3235–37 (Powell, J, concurring) but expressed no opinion on the issue of the remedies available to private plaintiffs, assuming the existence of a cause of action.

From the various opinions in Guardians Association it is clear that at least four members of the Court believe that private plaintiffs should be able to recover damages for all violations of Title VI and accompanying regulations, while at least two other justices believe that damages should be awarded only upon a showing of an intentional violation. Thus, all six members of the Court who have addressed the issue believe that plaintiffs can recover damages for intentional violations of Title VI.

This court is aware of pre-Guardians Association precedent in this circuit suggesting that plaintiffs here have no cause of action for damages, even upon proof of an intentional violation. In *Lieberman v. University of Chicago*, 660 F.2d 1185 (7th Cir.1981), *cert. denied*, 456 U.S. 937, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982), the court held plaintiff had no right to monetary relief for a violation of the sex discrimination provision of Title IX. *Justice White cited Lieberman* in his Guardians Association opinion for the general proposition that damages were inappropriate in Title VI actions. 103 S.Ct. at 3232, n. 23. As noted above, however, he then narrowed the application of this no-damages principle to cases where the discrimination was unintentional. We need not decide at this point whether Guardians Association supersedes Lieberman in cases where there has been an intentional violation of non-discrimination provisions.

the existence of a private right of action under § 905 to terminate financial assistance, the court went on to say, "Congress has pretty solidly indicated its intent that the relief which plaintiffs seek here is committed to administrative decision in the first instance subject to judicial review." *Id.* at 10. It concluded that "judicial oversight of an intervention in the administrative process under [§ 905] is ordinarily limited to judicial review under [§ 905(e)]." *Id.* Allowing plaintiffs to bring a *de novo* action against private defendants to prohibit their receipt of federal funds without adding as defendants the federal agency that distributes those funds and that has already decided in administrative proceedings not to terminate funding would circumvent the procedural provisions of the statute and implementing regulations. As the *Fizer* decision suggests, when a party seeks a funding cut-off for a recipient's violations of § 905's anti-discrimination provisions, it must do so through administrative proceedings followed by judicial review if agency action is unsatisfactory. *Cf. Green Street Association v. Daley,* 373 F.2d 1, 8–9 (7th Cir.1967) (affirming dismissal of suit to cut off federal funding for alleged violations of Title VI). *NAACP v. Medical Center, Inc.,* 599 F.2d 1247 (3d Cir.1979), *Cannon v. University of Chicago,* 441 U.S. at 716 n. 51, 99 S.Ct. at 1967 n. 51. The complaint here neither names the federal agency involved as a defendant nor seeks judicial review of agency action under § 905(e).

### B. *Failure to Meet Affirmative Action Requirements as a Violation of § 905*

The railroad defendants characterize count III of the complaint as claiming a wrongful failure to meet the goals of an affirmative action program to which defendants agreed to work towards as a condition of federal funding. They then contend that § 905 of the 4–R Act either provides no cause of action to enforce an affirmative action plan or, at best, gives plaintiffs only a right to seek judicial review of administrative decisions regarding defendants' compliance with the affirmative action program.

As previously noted, defendants' emphasis on the affirmative action allegations of count III is misplaced. Although count III does refer to the affirmative action requirements of the regulations promulgated by the Secretary of DOT, this court views those allegations as simply a description of one of the means by which the railroad defendants, in the context of their agreements with DOT to increase participation of minority business enterprises in railroad contracts, allegedly violated the non-discrimination provision of the 4–R Act.

### C. *Failure to Join an Indispensable Party*

The railroad defendants contend that count III must be dismissed for failure to join the administrator of the FRA as a party because the relief that plaintiffs seek—a cut-off of funds—is within the power of the administrator, who has already made decision not to do so in this case. Count III has been dismissed to the extent that it seeks an injunction against the continued receipt of federal funding by the railroad defendants, and the court therefore need not discuss the question of indispensable parties in any greater depth.

In sum, count III is dismissed to the extent plaintiffs seek an injunction against receipt of 4–R Act funds by the railroads.

### 4. *Counts IV: The Contract Claim*

Count IV is a common law breach of contract claim which alleges that the defendant railroads breached their funding agreements with the federal government by failing to comply with the non-discrimination and affirmative action provisions. The ability of this claim to survive defendants' motion to dismiss depends on whether the plaintiffs are third-party beneficiaries with rights to enforce the funding agreements. The existence of such third-party beneficiary rights is closely related to the question of whether plaintiffs have a private right of action under the 4–R Act. Just as we implied a private cause of ac-

tion, we find that plaintiffs were third-party beneficiaries of the funding agreements.

■ The first problem is choice of law. Federal common law applies to a plaintiff's third-party beneficiary claim if the outcome of the case will directly affect financial obligations of the United States or where a federal agency is a party to the action. *Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). *See generally, Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 640–41, 101 S.Ct. 2061, 2066–67, 68 L.Ed.2d 500 (1981); *City of Milwaukee v. Illinois,* 451 U.S. 304, 312–315, 101 S.Ct. 1784, 1789–1792, 68 L.Ed.2d 114 (1981). Otherwise, state law is applicable. Here, a federal agency is not a party and the outcome of the case does not threaten to affect substantial financial obligations of the federal government. Consequently, we look to Illinois contract law. *See Holbrook v. Pitt,* 643 F.2d 1261, 1270 n. 16 (7th Cir.1981).

■ The Illinois Supreme Court set out the test for third party beneficiary status over fifty years ago:

> The rule is settled in this state that, if a contract be entered into for a direct benefit of a third person not a party thereto, such third person may sue for breach thereof. The test is whether the benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract. If direct, he may sue on the contract; if incidental he has no right of recovery thereon."

*Carson Pirie Scott & Co. v. Parrett,* 346 Ill. 252, 178 N.E. 498, 501 (1931). *See also People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.,* 78 Ill.2d 381, 36 Ill.Dec. 338, 400 N.E.2d 918 (1980). The court must analyze each contract on a case-by-case basis, discerning the intent of the parties from first the contract itself and then, if necessary, from the surrounding circumstances. A contract need not be entered into for the sole benefit of a third-party in order to confer third party beneficiary rights on that party. *Robson v. Robson,* 514 F.Supp. 99 (N.D.Ill.1981), *aff'd,* 681 F.2d 820 (7th Cir.1982) (construing Illi-

nois law). Nor is it necessary that a contract for the benefit of a third-party identify that party by name. "The Contract may define a third-party by description of a class, and it is sufficient if the plaintiff may be identified at the time performance is due as a member of the class intended to be benefitted." *Altevogt v. Brinkoetter,* 85 Ill.2d 44, 51 Ill.Dec. 674, 679, 421 N.E.2d 182, 187 (1981). *See also Avco Delta Corp. Canada Ltd. v. United States,* 484 F.2d 692, 702 (7th Cir.1973).

The language of the non-discrimination provision in the funding agreements has changed since the inception of the 4–R Act. The agreements used between April 1978 and March 1980 read:

> *Nondiscrimination.* The Trustee has complied and will continue to comply, to the extent required to do so by law, with—
>
> (a) the provision of section 905 of the Act and all rules and regulations promulgated thereunder, including those set forth in 49 C.F.R. Part 265 (which are hereby incorporated by reference); and
>
> (b)(i) Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U.S.C. 2000d *et seq.* (hereinafter in this paragraph referred to as the "Act"), (ii) all requirements imposed by or pursuant to 49 C.F.R. Part 21, (iii) any regulations which may be issued by the Administrator in compliance with Department of Transportation Order No. 1000.12, and (iv) other pertinent directives, to the end that, in accordance with the Act, regulations, and other pertinent directives, no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under, any program or activity for which the Trustee receives assistance under this Agreement, and the Trustee hereby gives assurance that he will promptly take any measures necessary to effectuate this warranty.

The non-discrimination language in the agreements entered into during the spring of 1980 was nearly identical except that it did not include any reference to § 905 of the 4–R Act and accompanying regulations.[11]

In the agreements entered into beginning in June 1980 the non-discrimination language was toughened substantially:

*Affirmative Action Program.*

(a) It is the policy of the Department of Transportation that minority business enterprises as defined in 49 C.F.R. Part 23 shall have the maximum opportunity to participate in the performance of contracts financed in whole or in part with Federal funds under this Agreement. Consequently the minority business enterprise requirements of 49 C.F.R. Part 23 apply to this Agreement.

(b) The Trustee or its contractors agree to ensure that minority business enterprises as defined in 49 C.F.R. Part 23 have the maximum opportunity to participate in the performance of contracts financed in whole or in part with Federal funds provided under this Agreement. The Trustee or its contractors shall take all necessary and reasonable steps in accordance with 49 C.F.R. Part 23 to ensure that minority business enterprises have the maximum opportunity to compete for and perform contracts pursuant to this Agreement. The Trustee and its contractors shall not discriminate on the basis of race, color, national origin, or sex in the award and performance of contracts funded in whole or in part by Federal funds made available pursuant to this Agreement.

(c) The Trustee has submitted and the Administrator has approved a minority business enterprise affirmative action program which the Trustee agrees to carry out. This program is incorporated into this Agreement by reference. This program shall be treated as a legal obligation and failure to carry out its terms shall be treated as a violation of this Agreement. Upon notification to the Trustee of the failure to carry out the approved program, the Administrator shall impose such sanctions as noted in 49 C.F.R., Part 23, Subpart E, which sanctions may include termination of this Agreement or other measures that may affect the ability of the Trustee to obtain future financial assistance from the Administrator.

■■■ We believe that the contractual provisions in the post-June 1980 agreements are fairly construed as intending to bind the railroads to practice non-discrimination and to take steps for the benefit of MBEs to provide them with the "maximum opportunity" to participate in the 4–R funded projects. These later funding agreements expressly incorporate the "minority business enterprise affirmative action program[s]" and treat the terms of the plans as "legal obligation[s]." Failure to carry out the terms of the affirmative action plans are to be treated as violations of the

---

11. The non-discrimination language of the funding agreements which were used in the spring of 1980 provided:

*Nondiscrimination*

The Trustee has complied and will continue to comply, to the extent required to do so by law, with—

(a) Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U.S.C. 2000d *et seq* (hereinafter in this paragraph referred to as the "Civil Rights Act"), (b) all requirements imposed by or pursuant to 49 C.F.R. Part 21, (2) any regulations which may be issued by the Administrator in compliance with Department of Transportation Order No. 1000.12, and (d) other pertinent directives (including the Department of Transportation standard assurances required under 49 C.F.R. § 21.7 which are incorporated herein by reference), to the end that, in accordance with the Act, regulations, and other pertinent directives, no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under, any program or activity for which the Trustee receives assistance under this Agreement, and the Trustee hereby gives assurance that the Trustee will promptly take any measures necessary to effectuate this warranty.

We have used the funding agreements entered into by the Milwaukee Road as samples.

funding agreements themselves. It is difficult to imagine how an intention to have these funding agreements directly benefit MBEs could be more clearly expressed.

As noted above, the failure to specify in the funding agreements the particular MBEs to be benefitted is not determinative. It is enough that a class, the MBEs, was identified as entitled to benefit from the efforts of the railroads to provide MBEs with the maximum opportunity to participate in 4–R funded projects through the use of affirmative action programs. Nor is it important that the plaintiff class in this case includes only a portion, albeit substantial, of the MBEs entitled to benefit from the funding contracts. It is enough that plaintiffs belong to the class singled out for benefit.

The language of the earlier agreements do not unequivocally evidence an intention to directly benefit MBEs. Most of the agreements did provide, however, that the railroads would comply with the regulations promulgated under the 4–R Act; regulations which provided for plans designed to increase MBE participation in 4–R Act funded programs.

A consideration of the circumstances surrounding the funding contracts, however, supports a conclusion that the plaintiffs are third-party beneficiaries under the earlier funding agreements. The regulatory context of the funding agreements was the comprehensive effort of the DOT to end discriminatory practices on federally-funded transportation projects and to substantially increase MBE participation in such projects through the use of affirmative action programs. The legislative commitment to these goals was underscored in addition by Congress' creation of the MBRC in order to foster such increased participation.

The railroads themselves were made aware of Congress' desire to increase MBE participation in a very direct way. They were required to draw up and submit for approval detailed affirmative action plans. Under these plans they set up MBE development programs and designated an affirmative action liaison officer and staff.[12] The plans provided that the railroads would take a variety of steps to increase MBE participation, many of which required substantial expenditures of time and presumably money.[13] They required the railroads to maintain records on the results of their affirmative action plans and further required them to ensure that their major contractors adhered to non-discrimination and affirmative action requirements.[14] All of these efforts stemmed largely from the regulations implementing § 905 of the 4–R

12. The Milwaukee Road, for example, set up an Office of Minority Business Enterprise with wide-ranging duties to increase MBE participation. It designated a vice-president of administration as the MBE liaison officer whose responsibility was to run the MBE on the day-to-day basis with the assistance of a three person support staff. In addition, the railroad identified fifteen MBE coordinators who were supposed to assist in the implementation of the railroad's MBE program at the departmental level.

13. The Milwaukee Road affirmative action plan provided that the railroad would provide substantial guidance and technical assistance to MBEs who showed some promise of becoming useful suppliers. Among numerous other things, railroad employees were to provide MBEs with information about bidding procedures, assist them in preparing bids, consult with MBEs on their manufacturing methods, and help MBEs secure credit and raw materials discounts. The Milwaukee Road plan established detailed procedures to ensure that its major contractors complied with non-discrimination and affirmative action requirements. The plan also called for the use of "set-asides" in order to steer selected contracts to MBEs.

14. The Milwaukee Road plan, for example, provided for monthly (later quarterly) reports from each corporate department to the Railroad's Office of Minority Business Enterprise. The OMBE in turn was to present reports on the affirmative action program to top management on a regular basis. The plan established that department heads would consider the success of purchasing representatives in fostering MBE participation as a very important part of their performance review. In addition, the plan provided for a merit system designed to reward company employees whose efforts were instrumental in increasing MBE participation.

Act. They were designed to benefit a limited class of businesses—the MBEs.[15]

It should also be noted that the defendant railroads were not forced to either acquiesce to non-discrimination clauses or to implement affirmative action plans in order to increase MBE participation. The 4–R Act was Spending Clause legislation and the railroads were not obligated to abide by such conditions unless they accepted 4–R Act funds. *See Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981), *Guardians Association v. Civil Service Commission of the City of New York,* —— U.S. ——, 103 S.Ct. 3221, 3229, 77 L.Ed.2d 866 (1983). They were likewise free to stop receiving 4–R Act funds if they had found that in practice the attached non-discrimination and affirmative conditions proved to be too onerous.

The law in federal courts is somewhat unsettled on the existence of third-party beneficiary rights under the many different kinds of contracts between federal agencies and recipients of federal funds. This unsettledness is largely due to the case-by-case analysis which is necessary in order to determine the existence of an intent to confer third-party beneficiary rights. The Supreme Court has not directly addressed the issue, though the prospect of third-party beneficiary rights under federal contracts has not gone unremarked. *Compare Lau v. Nichols,* 414 U.S. 563, 571 n. 2, 94 S.Ct. 786, 790 n. 2, 39 L.Ed.2d 1 (1974) (Stewart, J., concurring in result) and *Guardians Association v. Civil Service Commission of the City of New York,* 103 S.Ct. at 3248 (Marshall, J., dissenting) with

*Guardians Association,* 103 S.Ct. at 3232, n. 24 (opinion of White, J.). A recent commentator concluded that when an essential purpose of a federal contract is to benefit a distinct class, courts generally permit class members to enforce the agreement. *Block, Enforcement of Title VI Compliance Agreements by Third Party Beneficiaries,* 18 Harv.Civ.Rts.-Civ.Lib.L.Rev. 1, 24 (1983) (article includes discussion of contracts of assurance such as the funding agreements here).

■ Under federal common law, "a third party may have enforceable rights under a contract if the contract was made for his direct benefit." *Holbrook v. Pitt,* 643 F.2d 1261, 1270 (7th Cir.1981) (and cases cited therein); *see also Local Div. 519 v. LaCrosse Municipal Transit Utility,* 585 F.2d 1340 (7th Cir.1978); *McDaniel v. University of Chicago,* 512 F.2d 583 (7th Cir.1975), *vacated and remanded* 423 U.S. 810, 96 S.Ct. 20, 46 L.Ed.2d 30 (1975), *reaff'd on remand,* 548 F.2d 689, *cert. denied,* 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978). Our analysis above of the funding agreements between the railroads and the federal government and the statutory, regulatory and operational context of these contracts indicate that they were made for the direct benefit of a limited class, the MBEs.

Federal courts have not hesitated to permit third parties to enforce non-discrimination provisions in funding agreements. The seminal case is *Bossier Parish School Board v. Lemon,* 370 F.2d 847 (5th Cir. 1967), where the court held that black

---

**15.** The following statement of the purposes of the Milwaukee Road affirmative action plan unequivocally singles out MBEs for special attention:

"... the company's overall objectives in the implementation of an effective Affirmative Action Plan are:

1. to integrate minority purchasing into the normal operating purchasing function;

2. to increase the number of minority suppliers used in our economic system, therefore, enhancing competition among our suppliers for the company's business resulting in higher quality goods and services at competitive prices;

3. to increase the dollar volume of purchasing from MBEs;

4. to improve the quality and increase the ability of MBEs to compete successfully and maintain volume purchases;

5. to promote the economic development and reduce the unemployment level of minority communities and among women; and

6. demonstrate the company's sensitivity to the special problems of MBEs, therefore, establishing a better relationship within the overall community in which this company is an essential entity.

Milwaukee Road Affirmative Action Plan, at 14–15.

school children had standing as third-party beneficiaries to sue under Title VI a school board which had accepted federal financial assistance. *Bossier* was cited in support of the implication of third-party beneficiary rights under federal funding contracts by the Seventh Circuit in *Holbrook, supra,* 643 F.2d at 1270. *See also Montgomery Improvement Association, Inc. v. H.U.D.,* 645 F.2d 291 (5th Cir.1981), *NAACP v. Wilmington Medical Center,* 453 F.Supp. 280 (D.Del.1978). *Dillon v. AFBIC Development Corp.,* 420 F.Supp. 572 (S.D.Ala. 1976), *modified,* 597 F.2d 556 (5th Cir. 1979). The existence of private rights of action under three statutory non-discrimination clauses closely related to the 4–R Act—Title VI, Title IX and Section 504 of the Rehabilitation Act—also suggest that plaintiffs here are third-party beneficiaries under federal common law.

In sum, the language and context of the funding agreements prompt us to deny the motions to dismiss count IV because, (1) the funding agreements with the federal government directly or indirectly obligated the railroads to take active steps on behalf of MBEs to increase their participation in 4–R Act projects; (2) these agreements were signed and were to be performed in a regulatory context clearly designed to assist MBEs; (3) under the affirmative action plans required by the agreements the railroads agreed to make institutional changes in order to increase the amount of procurement business given to MBEs, and (4) the railroads were not coerced to either accept or continue to shoulder the burdens of the non-discrimination and affirmative action provisions imposed by the funding agreements.

### 5. *Count V: The Antitrust Claim*

In count V the plaintiffs allege that the railroad and contractor defendants engaged in a boycott of the plaintiff companies in violation of the Sherman Act. In essence, the plaintiffs charge that the defendants worked together to exclude the plaintiffs from the railroad supply market. The railroad defendants allegedly refused to buy from plaintiff firms. The contractor defendants, according to the plaintiffs, changed their corporate structures in order to qualify as MBE's. In this way plaintiff firms were excluded from both the contracts given to MBEs under the affirmative action plans and those contracts given out by the railroads in their regular procurement programs.

For over seventy years, the rule of reason has been the principal test of the legality of practices which allegedly operate to restrain trade. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), *U.S. Trotting Association v. Chicago Downs Association, Inc.,* 665 F.2d 781, 787 (7th Cir.1981) (en banc). The focus of the rule of reason analysis is on "the challenged restraint's impact on competitive conditions," *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), *see also Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 268 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Typically, the rule of reason analysis requires a lengthy and detailed examination of a large number of relevant factors. As Justice Brandeis described the rule of reason approach:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse, but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

There are, however, a limited number of practices which are conclusively presumed illegal "because of their pernicious effect on competition and lack of any redeeming virtue". *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The *per se* violations include price-fixing agreements, *see United States v. Socony-Vacuum,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), market allocations, *see U.S. v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), certain type of tying arrangements, *see International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), and group boycotts, *see Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), *Fashion Originator's Guild of America, Inc. v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). Proof of the existence of one of these restraints results in an automatic finding of illegality without engaging in the elaborate inquiry mandated by the rule of reason. The rule of reason is supplanted by a *per se* rule, however, "only after courts have had considerable experience with the type of conduct challenged and application of the Rule of Reason has inevitably resulted in a finding of anticompetitive effects." *Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 555 (7th Cir.1980).

While the Supreme Court has consistently adhered to the position that group boycotts are illegal *per se,* there remains a great deal of confusion over the scope and operation of the *per se* rule against group boycotts. L. Sullivan, *Antitrust,* 229–230 (1977). One court defined a group boycott as

a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level. Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates. The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors, by inducing customers not to buy from them, or, in some cases, by refusing to deal with would-be competitors themselves. In each instance, however, the hallmark of the group boycott is the effort of competitors to "barricade themselves from competition at their own level." It is this purpose of excluding competition that has characterized the Supreme Court's decisions invoking the group boycott *per se* rule.

*Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1178 (D.C.Cir.1978) (footnotes omitted).[16]

Lower courts have long resisted applying a blanket *per se* rule to all forms of group boycotts. *See generally* Woolley, *Is A Boycott a Per Se Violation of the Antitrust Laws?,* 26 Rutgers L.Rev. 773, 775 (1974). The Seventh Circuit has pointed out that "[t]he danger of rote application of the per se rule to all conduct that can be called a 'group boycott' is that the sound teachings of experience will be extended into new and unfamiliar areas, where they have no proper application." *United States Trotting Association,* 665 F.2d at 788. Courts appear to focus on two factors when determining whether to employ a *per se* approach to a group boycott. First, at least some of the boycotters must be competitors of each other and the target. Second, the boycott must be designed to protect the boycotters from competition

**16.** The Seventh Circuit adopted this definition of group boycott in *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advertising Association, Inc.,* 672 F.2d 1280, 1284 (7th Cir. 1982). *See also U.S. Trotting Association v. Chicago Downs Association, Inc.,* 665 F.2d 781, 788 (7th Cir.1981) (en banc). Professor Sullivan describes illegal group boycotts as "an effort to exclude or cause disadvantage to one or more competitors by cutting them off from trade relationships which are necessary to any firm trying to compete." L. Sullivan, Handbook of the Law of Antitrust, 260 (1977).

with the target. *Spray-Rite Service Corporation v. Monsanto Company,* 684 F.2d 1226, 1236 (7th Cir.1982), *cert. granted,* — U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983).

■■■ Stated in another way, the first requirement for a *per se* boycott is an agreement among horizontal competitors to instigate a boycott of the target firm or firms. *See Davis Watkins,* 686 F.2d 1190 (6th Cir.1982), *U.S. Trotting Assn.,* 665 F.2d at 788. This emphasis on an agreement among horizontal competitors to boycott other competitors or potential competitors at the same level reflects the Supreme Court's emphasis on horizontal restraints as the primary source of antitrust harm and its growing tolerance for vertical restraints which have some efficiency justification. *See e.g. Continental T.V. Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 38, 97 S.Ct. 2549, 2551, 53 L.Ed.2d 568 (1977).

This requirement is met in this case. The defendant contractors are all in the railroad supply market. Plaintiffs are a class of firms who allegedly would be full-fledged competitors of the existing railroad suppliers but for an alleged boycott of their products and services by the defendants. They allege in the complaint that the contractor and railroad defendants agreed to engage in a boycott of the plaintiff firms. The railroad defendants are not, of course, horizontal competitors of the firms in the plaintiff class. Their role allegedly is the furtherance of the boycott by the refusal to purchase goods and services from the plaintiffs. As Professor Sullivan notes, "[t]he classic boycott . . . usually entails an effort to induce two or more suppliers or customers not to deal with firms being excluded from the protected area." Sullivan, *Handbook of the Law of Antitrust* 260 (1977).

■■■ The second requirement, that of anti-competitive design, is also met in this case. "[W]here the 'group boycott' under challenge does not involve a direct effort to influence the supply of, or demand for, a competitor's product, *per se* treatment may not be appropriate." *Phil Tolkan Datsun,*

*Inc. v. Greater Milwaukee Datsun Dealers' Advertising Association, Inc.,* 672 F.2d 1280, 1286 (7th Cir.1982). A boycott designed, however, to exclude competitors or potential competitors from the market is especially deserving of *per se* treatment. *U.S. Trotting Assn.* at 788. The Seventh Circuit has placed much emphasis on the purpose of the challenged activity in its recent group boycott decisions. *See e.g., Marrese v. American Academy of Orthopaedic Surgeons,* 706 F.2d 1488 (7th Cir. 1983) (defendant professional association took no action to directly affect plaintiff's access to suppliers or customers); *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advertising Association,* 672 F.2d 1280 (7th Cir.1982) (membership arrangements in trade associations an exception to *per se* group boycott rule; no showing that plaintiff's exclusion harmed plaintiff), *United States Trotting Association v. Chicago Downs Association, Inc.,* 665 F.2d 781 (7th Cir.1981) (*en banc*) (trotting horse association organized to ensure honest harness racing and not to restrain trade), *compare, Spray-Rite Serv. Corp. v. Monsanto Co., supra* (boycott accompanying price-fixing given *per se* treatment).

■■■ Here plaintiffs have alleged that the defendants worked together to exclude them from the railroad supply market or to at least minimize their share of the market. They have incorporated into their complaint the MBRC report which indicates that some majority-owned or -controlled contractors manipulated their corporate structure so that they would qualify as MBEs. This same report indicates that the percentage of railroad procurement business obtained by black and hispanic MBEs was a small fraction of the 15 per cent affirmative action goal. MBRC Report, Exh. 6.

At this early stage in the case dismissal of plaintiffs' antitrust claim would be inappropriate. "In antitrust cases, dismissals prior to giving the plaintiff an opportunity for discovery shall be granted very sparingly." *Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1282 (7th Cir.1983). We think they have suc-

cessfully alleged the existence of a group boycott *per se* violative of the Sherman Act.

In light of the care with which the Seventh Circuit limits the application of the *per se* rule to group boycotts it is prudent, however, to examine the alleged group boycott under the rule of reason. Here too the complaint survives defendants' motions to dismiss. The rule-of-reason test is "geared simply, clearly, and exclusively to the question whether the challenged conduct promoted or suppressed competition ...." *Wilk v. American Medical Association,* 719 F.2d 207, 225 (7th Cir.1983). *See also Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 268 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Once a plaintiff shows the anticompetitive effect of a challenged restriction it has made a prima facie showing of unreasonableness under Section One. *Wilk, supra,* at 227. The railroad supply market appears to be highly concentrated. The MBRC report attached to the complaint notes that "[i]t is estimated ... that 75 per cent of the [railroad] purchases are done through telephone negotiations with two or three known suppliers." MBRC Report at III–1. Thus, the wrongful exclusion of either the plaintiff class from the railroad supply market as a whole, or individual plaintiffs from specific product or service lines, may well have a substantial anti-competitive effect.

██ Defendants also argue for dismissal of count V because plaintiffs are allegedly employing antitrust laws to achieve civil rights objectives. This court rejects this contention on the ground that count V makes out a bona fide claim that members of the plaintiff class suffered economic injury as the result of a boycott which had an anti-competitive impact and affected interstate commerce.

The cases cited by the defendants in support of their argument are not applicable to this case. In some of them the plaintiffs grafted an antitrust claim onto an employment discrimination action. *See e.g., Daley v. St. Agnes Hospital,* 490 F.Supp. 1309 (E.D.Pa.1980); *Marchwinski v. Oliver Tyrone Corp.,* 83 F.R.D. 606 (W.D.Pa.1979); *Monk v. Island Creek Coal Co.,* No. 78–0258 (W.D.Va.1979); *NAACP v. New York Clearing House,* 431 F.Supp. 405 (S.D.N.Y. 1977); *Taterka v. Wisconsin Telephone Co.,* 394 F.Supp. 862 (E.D.Wis.1975), *aff'd,* 559 F.2d 1224 (7th Cir.1977), *cert. denied,* 434 U.S. 924, 98 S.Ct. 402, 54 L.Ed.2d 281 (1977). In those cases the plaintiffs failed to show an effect on interstate commerce or, more commonly, an injury stemming from the anti-competitive impact of the defendants' practice. *See also In re Multidistrict Vehicle Air Pollution,* 538 F.2d 231 (9th Cir.1976) (no antitrust injury).

In other cases cited by the defendants the alleged boycott did not implicate the antitrust laws because the boycott was directed at political rather than anti-competitive ends. *See e.g., Allied International, Inc. v. International Longshoremens Association,* 640 F.2d 1368 (1st Cir.1981) *aff'd,* 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982), (union members refused to handle goods as part of political protest); *Council for Employment and Economic Energy Use v. WHDH Corporation,* 580 F.2d 9 (1st Cir.1978), *cert. denied,* 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 633 (1979) (dispute over free advertising time given to political opponent); *Crown Central Petroleum Corp. v. Waldman,* 486 F.Supp. 759 (M.D.Pa.1980), *rev'd on other grounds,* 634 F.2d 127 (3d Cir.1980) (gas stations agreed to shut down in order to protest Department of Energy policies); *State of Missouri v. National Organization of Women,* 467 F.Supp. 289 (W.D.Mo.1979), *aff'd,* 620 F.2d 1301 (8th Cir.1980), *cert. denied,* 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980) (NOW boycott due to state legislature's failure to pass the ERA). These cases would only be helpful to the defendants if they concede that they have boycotted plaintiffs' goods and services and assert some political justification for their boycott. We don't understand defendants to be taking such a position.

The notion that group conduct is somehow outside the scope of the antitrust laws

if it has salutary non-economic purposes even though it has economic impact has found little favor with the courts. *See Wilk v. American Medical Association,* 719 F.2d 207 (7th Cir.1983). That notion, even were it valid, has scant applicability here, as plaintiffs' claims are on their face rooted in economic self-interest and complain of anti-competitive conduct by their erstwhile competitors. Defendants cannot reasonably claim that plaintiffs are unprotected by the antitrust acts; rather than seeking to justify a boycott, the defendants deny it.

**6. *Count VI: The Tortious Interference with Contract Claim***

Count VI alleges that the defendant contractors tortiously interfered with the "contractual and business relationships" of the plaintiffs. This count appears to contain two discrete causes of action. First, plaintiffs charge that the contractors tortiously interfered with the funding contracts between the railroads and the federal government by inducing the railroads to breach the affirmative action provisions in the agreements. The second cause of action is a claim that the contractors tortiously interfered with the prospective business opportunities of members of the plaintiff class by causing the railroads to fail to fulfill their affirmative action requirements.

▓▓▓ Plaintiff has not stated a claim for tortious interference with the funding contracts. The elements of that tort are: (1) an existing contract between the plaintiff and a third party; (2) defendant's knowledge of this contract; (3) an intentional unjustified inducement to breach the contract; (4) a subsequent breach by the third party; and (5) resulting damage to the plaintiff. *Hannigan v. Sears, Roebuck and Co.,* 410 F.2d 285, 291 (7th Cir.1969), *cert. denied,* 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 17 (1969), *Martin v. Federal Life Insurance Co.,* 109 Ill.App.3d 596, 65 Ill. Dec. 143, 151–52, 440 N.E.2d 998, 1006–07, (1st Dist.1982). Implicit in this definition is the requirement that the plaintiff be a party to the contract. *See* Restatement (Second) of Torts § 766 and comment P.

Arguably, the plaintiffs' status as third-party beneficiaries under the funding agreements and as targets of the contractors' alleged wrongdoing is enough to permit them to maintain a tortious interference action. By focusing on the motive and purpose of the wrongdoer rather than rights under the contract courts in a few jurisdictions have suggested that non-parties to a contract singled out for harm by the defendant can sue for the injuries suffered as a result of the defendant's tortious interference with a contract. *See DeVoto v. Pacific Fidelity Life Insurance Co.,* 618 F.2d 1340 (9th Cir.1980), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980), and cases cited therein. There is no indication, however, that the courts in this circuit have adopted this approach. All the relevant precedent suggests that only direct parties to a contract, and not third-party beneficiaries, can maintain a tortious interference action.

▓▓▓ A claim for the tortious interference with a prospective business opportunity is established by: (1) the existence of a valid business relationship or expectancy, (2) knowledge of that relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) damage resulting from the disruption. *Knapp v. McCoy,* 548 F.Supp. 1115, 1117 (N.D.Ill.1982); *Bank Computer Network Corp. v. Continental Illinois National Bank,* 110 Ill.App.3d 492, 66 Ill.Dec. 160, 166, 442 N.E.2d 586, 592 (1st Dist.1982). Plaintiffs have alleged these four elements. Some of them already had business relationships with the railroads, which would likely expand under the affirmative action plans. Other plaintiff companies could expect to establish business relationships with the railroads on 4–R Act funded projects. The contractor defendants allegedly knew of the possibility that up to fifteen per cent of the 4–R Act funded work could go to MBEs and took steps to prevent the development of

business relationships between MBEs and the railroads. As a result of the efforts of the contractors plaintiffs allege they suffered substantial economic harm.

In sum, Count VI is dismissed to the extent that plaintiff alleges tortious interference with the funding contracts between the railroads and the federal government. Plaintiffs have stated a claim for the tortious interference with prospective business opportunities.

7. *Count VII: The Conspiracy Claim*

■ In Illinois "a civil conspiracy arises where two or more persons combine to accomplish by concerted action either a lawful purpose by unlawful means or an unlawful purpose by lawful means." *De-Valk Lincoln Mercury, Inc. v. Ford Motor Co.,* 550 F.Supp. 1199, 1203 (N.D.Ill.1982) (construing Illinois law). *See also Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir. 1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (42 U.S.C. § 1985 action). Count VII alleges that defendants conspired to deny plaintiffs their rights under §§ 1981 and 1982. Plaintiffs were apparently forced to frame count VII as a common law conspiracy because of the Supreme Court's decision in *Great American Federal Savings and Loan Association v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) that 42 U.S.C. § 1985 could not be invoked to redress violations of Title VII.

■ Since plaintiffs' § 1982 claim has been dismissed, count VII is likewise dismissed to the extent it covers § 1982. Defendants' other objections to the conspiracy claim have been dealt with elsewhere. The complaint as a whole does allege a conspiracy to violate § 1981 with sufficient specificity to survive a motion to dismiss. Plaintiffs have standing as MBEs to bring the conspiracy count just as they have standing to bring the § 1981 claim. Defendants have not challenged plaintiffs' right to bring this action under Illinois common law. Hence, with the above proviso, defendants' motion to dismiss count VII is denied.

*Motions for Summary Judgment*

The individual contractors have also moved for summary judgment. Summary judgment is to be granted where, on the basis of pleadings and supporting documents, there remains no material issue of fact to be tried. *Kirk v. Home Indemnity Co.,* 431 F.2d 554, 559 (7th Cir.1970). Summary judgment will be granted only where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Fitzsimmons v. Best,* 528 F.2d 692, 694 (7th Cir.1976). The burden is upon the moving party to show that there is no issue of material fact in dispute. *Rose v. Bridgeport Brass Co.,* 487 F.2d 804, 808 (7th Cir.1973). All doubts as to the issue of material fact must be resolved against the movant. *Moutoux v. Gulling Auto,* 295 F.2d 573, 577 (7th Cir.1961). This court is also cognizant of the fact that discovery has just begun in this case.

*Wheels Inc. and Z.S. Frank*

■ The basis for the motion for summary judgment by Wheels Inc. and its officer, Z.S. Frank, is Z.S. Frank's affidavit that Wheels Inc. never held itself out as a minority business. Plaintiffs have responded with an assertion that Wheels Inc. was listed as an MBE by Chicago & Northwestern Railroad, but has failed to supply the necessary evidence in support of this alleged fact. Summary judgment is thus appropriate but with the proviso that plaintiff can bring these defendants back into the case with proof that Wheels, Inc. was listed as an MBE. At this stage in discovery such a showing would raise an issue of material fact.

*Clara A. Bair, Robert Holden, Harold R. O'Connor, Atlas Railway Supply Company and Unity Railway Supply Company*

■ We deny the motion of these defendants for summary judgment. There exist disputed issues of material fact as to whether the defendant companies improperly held themselves out as MBEs. At this

early stage in discovery this court is reluctant to find that there is no disputed issue of material fact as to the role these railroad supply companies may have played in the relations between the railroads, the established contractors and the plaintiff MBEs.

### R.A. Pinney Co., Inc. and Richard A. Pinney

The summary judgment motion of these defendants is denied. Plaintiffs have pointed out that there are disputed issues of material fact as to the purpose of the transfer of 51 per cent of the company's stock from Mr. Pinney to his wife in 1977, the year the 4–R Act affirmative action plans became effective, and as to the Pinney Co. practice of listing majority-owned firms as MBEs for 4–R Act reporting purposes.

### Rails Ltd., John J. Hickey and Louis Gruber

Summary judgment in favor of these defendants is denied because the company was listed as an MBE by one of the defendant railroads. Further discovery may show that these defendants had no role in this listing, but at this point summary judgment is inappropriate.

### Koppers Company, Inc.

Koppers Co.'s motion for summary judgment will also be denied. As a large contractor Koppers was required to meet non-discrimination and affirmative action requirements under 49 C.F.R. § 265.11(b). Plaintiff has adequately raised a material issue of fact by pointing out that many of the Koppers contractors listed as MBEs may not have been MBEs. The implications of this fact are disputable and relate to all of the allegations in counts V–VII.

In sum, with one exception, the motions for summary judgment by the defendant subcontractors are denied. The basis for this holding is primarily the lack of discovery. This court may well look more favorably upon later summary judgment motions if the plaintiff fails to show more clearly, after further discovery, the existence of disputes over material facts. We will not burden any party with either unnecessarily burdensome discovery or a vexatious trial.

## CONCLUSION

The individual corporate plaintiffs have standing to maintain this action in all respects. OMVI has standing to seek injunctive relief only. Count II of the complaint is dismissed. Count III is dismissed to the extent it seeks an injunction against the railroads' receipt of 4–R Act funds. Count VI is dismissed except to the extent it states a cause of action for tortious interference with prospective business relationships. Count VII is dismissed to the extent it alleges a conspiracy to violate 42 U.S.C. § 1982. The remaining motions to dismiss are denied. All the motions for summary judgment by the contractor defendants are denied with the exception of that filed by Wheels, Inc. and Z.S. Frank.